UNITED STATES *v.* HENRY W. PEABODY & Co. (No. 4690) [1]

United States Court of Customs and Patent Appeals, April 8, 1952

*Charles J. Wagner*, Acting Assistant Attorney General (*Richard F. Weeks* and *Joseph F. Donohue*, special attorneys, of counsel), for the United States.

*B. A. Levett* (*Meyer Ohlbaum* of counsel) for appellee.

[Oral argument December 4, 1951, by Mr. Donohue and Mr. Levett; reargued October 7, 1952, on petition for rehearing by Mr. Levett and Mr. Weeks]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, COLE, and JACKSON (retired) before rendition of former decision but recalled to sit in place of WORLEY, Judge, who did not sit during reargument and did not participate in the second decision.

WORLEY, Judge, delivered the opinion of the court:

This is an appeal by the Government from a judgment of the United States Customs Court, Second Division, Reap. Dec. 7999, in a reappraisement proceeding involving eleven appeals to reappraisement, Nos. 140737–A to 140748–A, inclusive.

The merchandise consists of safety matches imported from Finland and entered at the port of New York in the years 1929–1931. The

[1] C. A. D. 498.

matches were invoiced and entered at $14.00 per case, less certain nondutiable items, and were appraised under section 402 of the Tariff Act of 1930 at "C. O. P. 28.0057 Finnish Marks per 1 gross Boxes." The merchandise was further appraised under the Antidumping Act of 1921 at "Unit Purchase Price (section 203) at $0.51828 per 1 gross boxes," and "Unit Cost of Production (section 206)" at "Finnish Marks 28.0057 per 1 gross boxes."

The appraisements were made in June and July of 1941, approximately eleven years after entry.

The importer appealed for reappraisement under the provisions of section 501 of the Tariff Act of 1930 and section 210 of the Antidumping Act of 1921.

In his opening statement before the single judge, counsel for the importer contended that the appraisements were null and void because the applicable customs regulations were mandatory and had not been complied with, that is, no representative of the importing firm had been notified to appear before the customs officials, as provided by the regulations of the Secretary of the Treasury, article 790 of the Customs Regulations of 1937, which prescribes for the administration of the Antidumping Act of 1921, the pertinent parts of which read as follows:

Art. 790. Action by appraiser when not [sic] finding of dumping has been published.—(a) Antidumping Act, 1921, section 201 (b):

Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, the appraiser or person acting as appraiser has reason to believe or suspect, from the invoice or other papers or from information presented to him, that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the cost of production) he shall forthwith, under regulations prescribed by the Secretary, notify the Secretary of such fact and withhold his appraisement report to the collector as to such merchandise until the further order of the Secretary, or until the Secretary has made public a finding as provided in subdivision (a) in regard to such merchandise.

(b) When the appraiser has reason to believe or suspect that merchandise is imported in violation of the antidumping act, he shall immediately request the importer thereof or his authorized agent to appear before him in order that he may obtain whatever information the importer or his agent may have relative to the matter.

\*      \*      \*      \*      \*      \*      \*

Substantially the same provisions were contained in article 792 of the Customs Regulations of 1931 and article 713 of the Customs Regulations of 1923, hence such regulations were in full force and effect during the time from the first entry in 1929 until the goods were appraised in 1941.

The trial judge cited, with seeming approval, the holding in the case of *Vulcan Match Co., Inc.* v. *United States*, 5 Cust. Ct. 188, C. D. 398, that "\*   \*   \*   such regulations were held to confer upon the

importer a substantial right in the protection of his property, viz, that of furnishing information to the appraiser on the basis of which a determination of the status of his imported merchandise depends, and to be mandatory in nature, requiring compliance therewith as a condition precedent to a valid appraisement under the antidumping act," but expressly held, however, that the evidence offered by the importer was insufficient to overcome the presumption of due performance of duties by public officials.

We deem it advisable to quote at some length from the opinion of the trial judge as follows:

A careful review of the evidence leads to the conclusion that plaintiff failed to support its contention by sufficient competent and material evidence. At the time of the importations in question, plaintiff was a partnership composed of four general partners and one special partner. Two of the partners, one of whom had been in direct charge of the import division of the firm, were called to testify, as well as the firm's accountant at that time. The partner who had been in charge of the import division did not deny that he had ever attended any conference with the appraiser or anyone connected with the appraiser's or collector's offices, but stated that he did not recall any such incident. He stated that if there had been any request for such conference it would have come to him, and he did not recall receiving any such notice or request.

Although he stated on cross-examination that he believed that had any of the other partners had any conversations with anyone in the customs service relative to prices, sales, or purchases of matches, they would have informed him, he was, up to the time of the trial, apparently unaware that so-called "nonexporter's" affidavits, required under section 208 of the antidumping act and articles 790 and 794 of the Customs Regulations of 1937, article 792 of the Customs Regulations of 1931, and article 713 of the Customs Regulations of 1923, stating the status of the importer and the purchase price, etc., had been signed by two other partners in the firm and filed with the papers.

One of the other partners, appearing as a witness on behalf of the plaintiff, directly denied that he had ever been called upon to appear before any Government officials in connection with the shipments. He stated that he had "probably" signed certain of the "nonexporter's" affidavits bearing his signature above referred to, but had no other knowledge of the controversy until notice of advance on appraisement had been received in 1941.

The firm's accountant at the time of the importations in question was called to the stand and stated that he had never been called by or had any conference with any Government officials in connection with the shipments.

It appears that one of the three other partners died in 1934, but neither of the other two surviving partners of the firm was called to testify, although the identified signature of one of them appears on two of the "nonexporter's" affidavits filed with the papers in the case at bar, indicating that, despite the belief expressed by plaintiff's witnesses that the said surviving partner could have had nothing to do with the matter, he must have had some contact with it.

I am of the opinion that the evidence offered on behalf of the plaintiff is not sufficient to overcome the presumption of the due performance of their duties by public officers. *Knauth, Nachod & Kuhne* v. *United States*, 13 Ct. Cust. Appls. 324, T. D. 41234. The plaintiff has not offered sufficient evidentiary facts establishing directly or by reasonable inference any ultimate fact inconsistent with the presumption that the appraiser would not omit anything which his official duty required to be done.

Upon appeal, the appellate division expressly adopted the doctrine of the case of *Vulcan Match Co.*, *supra*, that the involved regulations were mandatory, but reversed the judgment of the single judge, holding that the weight of the evidence established that the customs officials had not complied with the prescribed regulations.

Here, counsel for appellant properly urges that the only issue before us is whether substantial evidence exists to support the judgment of the appellate division. *Mutual Supply Co.* v. *United States*, 38 C. C. P. A. (Customs) 44, C. A. D. 437.

It is axiomatic, of course, that a public official is presumed to discharge his duties in accordance with the law and regulations governing his employment. Here, in order to rebut that presumption, it is incumbent upon the importer to prove by competent evidence that such presumption is erroneous. In other words, he must prove a negative.

In his efforts to discharge that burden, the importer called four witnesses. Those witnesses in the order of their appearance were Mr. Frank L. Cusack, Mr. Arthur F. Barlow, Mr. Frederick W. Lincoln, and Mr. Fred C. Guerriero.

The record reflects some question as to the actual connection of Mr. Cusack with the importing company; for example, the following colloquy occurred on his cross-examination:

> XQ. Were you a member of the firm?
> A. No, sir.
> XQ. Just an employee?
> A. That is right.

However, on the other hand, Mr. Lincoln, an actual partner stated "* * * all the details in connection with the importation were in charge of Frank Cusack, the *partner* who was in charge of the import." (Italics supplied.) Be that as it may, Mr. Cusack testified that during the time of the importations he was employed as import traffic manager and in complete charge of all imports; and that while he could not recall any conference with any of the customs officials, had any call been made to his office, it would have come to him. It will be noted that Mr. Cusack merely assumed that because of the nature of his duties, that it was he who would have been contacted, but instead of denying that he was actually called, he testified he could not recollect any such request.

The second witness, Mr. Barlow, an accountant in the importing company from 1919 until its liquidation in 1932, stated that he had succeeded Mr. Cusack when Mr. Cusack left the concern. He testified that while he was familiar with the importation of matches from an accounting standpoint, he was not as familiar with them as was Mr. Cusack. He stated positively he had never had any conference

with any Government officials in connection with the involved importations.

The third witness, Mr. Frederick W. Lincoln, testified he was a partner in the firm from 1925 to 1932; that he recalled the involved importations but had nothing to do with them at the time they came in; that all the details in connection therewith were in charge of Mr. Cusack; that he was positive he was never called upon to appear before any Government officials in connection with the involved shipments. He testified further that a Mr. Brian, another partner, was in charge of or was connected with the importations but that to the best of Mr. Lincoln's knowledge Mr. Brian was never called, although he felt that Mr. Brian would have mentioned it to him had such a summons been received. He also testified that at the time of the importations he did not recall whether he had received from the customs officials a notice of a suspicion of dumping but that he had "probably" received and signed nonexporter's affidavits,[1] and that either he or Mr. Brian, or *one of the other partners* did sign said affidavits. He testified further that outside of probably signing the above affidavits he had no knowledge of any controversy with the Government until 1941 when notices were received that the merchandise had been appraised. On cross-examination, he testified as to the genuineness of Mr. Brian's signature on a number of nonexporter's affidavits acknowledged before a Notary Public during 1930 and 1931, and testified further that in 1929 he was aware that the customs officials had under consideration the question of dumping relating to the involved matches. He testified further on cross-examination as follows:

XQ. It is possible that either one or the other [partners] did come down, or did not come down?

A. Very improbable. It is possible but improbable because they were the older partners. They were well in their 70's at that time, and it is unlikely that they would have been the partners that would have been selected. Probably it would have been either Mr. Brian, Mr. Cusack, or myself, but more likely it would have been Mr. Cusack who would have been selected to go on a matter of that sort.

XQ. Well, Mr. Cusack had nothing to do with purchases or sales of this merchandise, did he?

A. No, but he had something to do with anything that had to do with the importation, the handling of documents he had to do with, and that came under his job as part of Traffic Manager, and we were importing numerous things, and *no one man just had one job.* (Italics supplied.)

---

[1] Art. 790, Customs Regulations, 1937.
* * *
(d) If the appraising officer is then satisfied that there is no reasonable ground for his belief or suspicion, he may pass the merchandise in the usual manner without giving notice to the Secretary.

(e) If the appraiser is not satisfied, he shall require the importer or his agent to file an affidavit on one of the following forms, according to the circumstances of the case: * * * ["Nonexporter's Affidavit" or "Exporter's Affidavit Where Sales Price is Not Known"].

The fourth witness called by the importer was Mr. Guerriero, an examiner at the appraisers stores, who testified that he did not become Examiner of Matches until 1938 and that the reason for the delay in making the involved appraisement was because of a departmental decision setting up a cost of production schedule.

The single witness for the Government, a Mr. Bunting, stated he held the position of Examiner of Matches from 1929 to 1930, as well as other periods of time, and testified as follows with respect to the notices reflecting a suspicion of dumping:

Q. And with respect to the Anti-Dumping Act of 1921, as to matches, can you tell me what your practice was with respect to a suspicion of dumping in connection with matches?

A. The practice was following the regulations to summon the importer or someone representing him to our office for a consultation to see his records. *That was the universal—that was our practice, and I believe it must have been followed in this case.* I have not, however, any specific recollection of having seen any of the people from Peabody. It is 16 [sic] years ago, and I can't remember specifically any individual instance. (Italics supplied.)

Mr. Bunting testified that he remembered having seen Mr. Lincoln but could not specifically say that he had requested Mr. Lincoln to come to his office on the matter here in dispute. His testimony in connection with the nonexporter's affidavits under the Antidumping Act of 1921 is as follows:

Q. You have seen, in these papers which are involved in the various cases before the Court, the Non-Exporters affidavit under the Anti-Dumping Act of 1921?

A. I have.

Q. And can you tell me whether those forms are kept in the Appraiser's Office by the Examiners?

A. They are.

Q. And do the Examiners hand these out to anyone when they are necessary under the Anti-Dumping Act?

A. They would hand them out to the importer, and also to the brokers, to anyone connected with the transaction.

Q. Have you any recollection as to whether you handed this to any member of the firm as you heard each one of the witnesses testify, there were four members of the firm, regular members, and then there was a special member, or whether you handed it to a broker, or a broker's representative as the agent for the importer?

A. I wouldn't make any statement under oath that I have done that. It is too far back. I wouldn't be prepared to say that.

Viewing the record in its entirety, it is our belief the importer has failed to present any substantial evidence to rebut the presumption that the customs officials properly discharged their duty. It is to be noted that only one of the partners, Mr. Lincoln (assuming that Mr. Cusack was correct in stating he was only an employee), was called as a witness. His testimony relating to the possible actions of the other partners proves nothing.

Although one partner had died prior to the trial of this case, there is nothing to show why the other partners were not called. Under

such circumstances, we believe it reasonable to assume that had they appeared, their testimony would not have been favorable to the importer's cause.

The testimony of Mr. Cusack was, to our way of thinking, not sufficiently positive to assist in rebutting the hereinbefore mentioned presumption.

While we believe all the witnesses called were honest and truthful, it is to be remembered that the testimony submitted related principally to events or possible events which occurred approximately 18 years previous to trial. Under the circumstances of this case, we are not reluctant to say that such an uncommon delay on the part of the Government in the disposition of the matter has elicited our sympathy for the importer. However, it is, of course, not our personal feelings but the facts and applicable law which must prevail.

Since, in our opinion, appellee has failed to sustain the burden of proof resting upon him, the decision of the appellate division of the United States Customs Court should be and is hereby *reversed.*

---

DECISION ON REHEARING

November 4, 1952.

JACKSON, Judge.

The decision in this appeal was rendered April 8, 1952, and the copies thereof were forwarded to counsel for the parties. On May 26, 1952, a petition for rehearing was filed by counsel for appellee. Counsel for the Government filed an opposition to the petition on June 4, 1952. Thereafter, on June 24, 1952, the court, having duly considered the matter, granted the petition and ordered oral arguments thereon which were made October 7, 1952.

In the petition it was suggested that the court had misapprehended the measure of evidence produced in support of the "finding of fact" made by the Division of the United States Customs Court sitting in reappraisement.

It was further suggested that this court had weighed the evidence instead of, as is required by law, examining it to determine whether there was any substantial evidence to support the "finding of fact" of the lower court.

It was also suggested that in examining the record, this court overlooked vital parts thereof, although they had been referred to in the brief filed on behalf of appellee.

A reading of the opinion will clearly demonstrate that the court fully realized that the appeal was in a reappraisement proceeding and that its sole function in such a case is to determine "whether

substantial evidence exists to support the judgment of the appellate division."

There is nothing in the opinion that would even faintly indicate that the court had weighed the evidence rather than followed the law with respect to the existence of substantial evidence and we find nothing in the opinion or the record wherein it could properly be inferred that the court had overlooked any "vital part" of the latter.

It may be noted that in the opinion there appear pertinent parts of Article 790 of the Customs Regulations of 1937 prescribing the administration of the Antidumping Act of 1921; a lengthy quotation from the opinion of the single judge of the United States Customs Court who tried the case and who ruled in favor of the Government; the names of all of the witnesses who appeared on behalf of appellee and short statements of their testimony; and also some of the testimony given by the single witness for the Government who had been the Examiner of Matches from 1929 to 1930.

In view of the record, it was held by this court that the importer had failed to adduce any substantial evidence to rebut the presumption of correctness that the customs officials had properly discharged their duty.

As a matter of emphasis, we deem it proper to call attention to some of the provisions of the hereinbefore mentioned article of the customs regulations, not quoted in the opinion, as follows:

\*        \*        \*        \*        \*        \*        \*

(b) When the appraiser has reason to believe or suspect that merchandise is imported in violation of the antidumping act, he shall immediately request the importer thereof or his authorized agent to appear before him in order that he may obtain whatever information the importer or his agent may have relative to the matter.

(c) Upon the appearance of the importer or his agent, he shall be questioned in order to ascertain—

First. The person by whom or for whose account the merchandise is imported.

Second. The facts necessary to establish whether such person is or is not the exporter within the meaning of section 207.

Third. The nature and amount of each item to be added to or deducted from the basic price in accordance with section 203 or section 204, in order to determine the purchase price or the exporter's sales price, as the case may be.

Fourth. His knowledge, if any, of the wholesale foreign-market value, the price to countries other than the United States, or the cost of production.

Fifth. The reason for the price differential.

Sixth. The relative wholesale quantities, if the difference in such quantities is claimed in whole or in part as the reason for the price differential.

It is quite evident, as may be noted from the former opinion, that the appraiser had reason to believe or suspect that the merchandise was imported in violation of the Antidumping Act. It is also clear that the appraiser required the importer to file affidavits. Otherwise we can perceive no reason why they were filed. That clearly indicates

that under subparagraph (e), set out in the opinion, the appraiser was not satisfied. Such dissatisfaction, in our opinion, could not have arisen unless the importer or his agent had appeared before the appraiser and was questioned in accordance with the provisions of subparagraph (c), hereinbefore quoted. In any event, the filing of the affidavits would so indicate and it has not been shown by evidence, direct or indirect, that the appraiser did not properly conform to the regulation.

After a careful review of the record and the contentions made on behalf of appellee in connection with the petition for rehearing, we find no reason to disturb our original decision and it is *reaffirmed*.